# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 19-747 c/w 19-748


**DEBRA WHITE**

**VERSUS**

**WIS INTERNATIONAL**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 2
PARISH OF RAPIDES, NO. 16-05483 c/w 17-04230
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*

**D. KENT SAVOIE**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John E. Conery, D. Kent Savoie, and Jonathan W. Perry, Judges.


**AFFIRMED.**

**W. Jay Luneau**
**Robert L. Beck III**
**Matthew T. Seaton**
**Luneau & Beck, LLC**
**5208 Jackson Street Extension, Suite A**
**Alexandria, LA 71303**
**(318) 445-6581**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Debra White**

**Eric J. Waltner**
**Allen & Gooch**
**P. O. Box 81129**
**Lafayette, LA 70598-1129**
**(337) 291-1400**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Washington Inventory Service Inc.**

**SAVOIE, Judge.**

In this workers' compensation case, the claimant, Debra White ("Ms. White"), appeals a judgment finding that she made intentional misrepresentations in violation of La.R.S. 23:1208 and dismissing her claims for benefits. For the following reasons, we affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

Ms. White was an employee of Washington Inventory Service Inc. ("WIS") on May 28, 2016, when she fell while working at an Office Depot Store. She completed an incident report reflecting that she "tripped over [a] rail" as she was walking into the store, and further indicating that she injured both of her knees, her right elbow, and her lower back. She also noted that the nature of her injuries was "skin off elbow, pain in both knees," and tension and pain in her lower back.

Shortly following the accident, she obtained medical treatment from the emergency room at Christus Cabrini Hospital. The medical records from the hospital reflect that Ms. White's chief complaint on the day of the accident was bilateral knee pain and lower back pain from a fall at work. The records further reflect that she had a history of chronic back pain, knee surgery, and hypertension. X-rays were taken of her knees and spine, and she was discharged with prescriptions for medication to address pain and muscle spasms.

On June 1, 2016, Ms. White saw Dr. Ravinderjit Brar with Kisatchie Medical Center. Medical records from that date reflect that Ms. White reported bilateral knee pain as a result of her fall at work, with the right knee hurting worse than the left, and also that she needed to refill her prescriptions. The records further reflect a past medical history of "back pain after car wreck." Dr. Brar

prescribed gabapentin and provided her with a certificate to return to work beginning on June 4, 2016.

On July 27, 2016, Ms. White saw Dr. Gerald LeGlue, Jr. The record includes a July 27, 2016 letter from Dr. LeGlue to Ms. Rebecca Molina, who was the workers' compensation claims adjuster handling Ms. White's claim stating:

> The patient reports she was walking through a doorway when her foot apparently caught on a track for the door, and she fell forward to the ground. She was able to avoid striking her face in that she apparently caught herself on her elbows and knees. There was no loss of consciousness. She was seen that day at Cabrini's Emergency Room with x-rays done of the right knee which revealed subpatella edema as well as lumbosacral x-rays, given prescriptions, and discharged. She had been seen by a primary physician on a couple of occasions and sounds like she has been given anti-inflammatories. She continues to report neck pain with headaches, left arm paresthesias, and lower back pain and bilateral lower extremity pain and paresthesias. . . .
>
> Past medical history is significant for having bilateral knee surgeries historically. She also had a motor vehicle accident on October 23, 2015, in which she had neck and back pain. Workup revealed cervical and lumbar protrusions, and it was suggested that she have [a] surgical evaluation done. It appears there were financial issues with regard to being treated, and therefore, did not have any further treatment after last seen in December 2015. She reports that symptoms had improved slowly over the months that ensued, although she did continue with some baseline pain. She reports the pain is now more intense and constant but no change in the nature or location of pre-existing back and neck pain.
>
> . . . .
>
> My impression is that of a history of cervical and lumbar protrusions with possible worsening of the lesions noted historically. She also appears to have significant arthritis in both knees as well as probable bursitis. Lastly, there appears to be a left rotator cuff strain as well.
>
> At this point, I would like to obtain cervical, lumbar, and left rotator MRI scans. She is cleared to do sedentary activities only. I would like to have an evaluation by Dr. [Jeffery] Garrison who has done her knee surgeries historically and would be in a better position to comment on pre-existing issues. . . . I am going to see Ms. White again after her MRIs are performed and will address their findings accordingly.

2

Dr. LeGlue's records from July 27, 2016, also include an "excuse slip" stating "Patient restricted to sedentary activities only. No lifting over 10lbs. Occasionally. No working at/or above shoulder level (L) side. No repetative [sic] bending, stooping, squatting, twisting until follow-up after MRI's & orthopaedic evaluation."

After receiving Dr. LeGlue's report, WIS began paying Ms. White Temporary Total Disability benefits ("TTDs") effective July 27, 2016.

Ms. White saw Dr. LeGlue again on August 24, 2016. His report to Ms. Molina that same day reflected that "[b]oth cervical and lumbar MRI scans were significantly abnormal as well as left shoulder." The report further noted Dr. LeGlue's recommendation for an orthopedic surgical evaluation for possible left rotator cuff surgery as well as a spine surgical evaluation.

On August 29, 2016, Ms. White saw Dr. Mark Dodson with a chief complaint of "bilateral knee pain." The report from that date notes that Ms. White fell at work, has pain with range of motion walking, and "patient states she did not have any pain prior to her fall." The report further states "Patient has degenerative arthritis of her knees. It would be difficult to relate an on-the-job injury to her arthritic knees." The report also noted that, according to Ms. White, she was being seen by other doctors for her left shoulder and spine.

On August 31, 2016, Ms. White filed a Form 1008 Disputed Claim for Compensation seeking indemnity payments from the date of her fall, as well as penalties and attorney fees as a result of WIS' failure to pay indemnity benefits from the date of the fall through July 27, 2016. Therein, she alleged that she sustained injuries to her knees, upper back, neck, and left shoulder as a result of the May 28, 2016 fall.

A default judgment was eventually rendered against WIS and in favor of Ms. White for TTDs beginning from the date of the incident; however, that judgment was later reversed on appeal, and the matter was remanded for further proceedings. *White v. WIS International*, 17-132 (La.App. 3 Cir. 10/25/17), 230 So.3d 246.[1]

Dr. Malcom Stubbs evaluated Ms. White in October 2016, following the referral from Dr. LeGlue pertaining to her left shoulder, and he performed surgery on her left rotator cuff in November 2016.

Ms. White then saw Dr. Douglas Bernard on November 28, 2016, for an independent medical examination. Dr. Bernard noted in his report that Ms. White

> can't say exactly how she fell, but it bothered her mostly in the right elbow, her knees and her lower back at first. . . . At first it was her knees, they were hurting and burning. She states she skinned her right elbow and her lower back hurt. She states a few days later is when she felt her neck and her shoulders. Her right shoulder bothered her the most and she is not sure why they operated on the left one first. She was very animated with her lower extremities and upper extremities, putting her right hand behind her back to point out her lower back area and doing a voluntary straight leg raising to point out numbness on the bottom of her feet. . . . Upon going through her past history, she had apparently been involved in an auto accident in October 2015, and after some time she finally remembered that it was Dr. LeGlue that she saw for that accident and he just put her on gabapentin and other medicines. She is not sure what test she had done back then. She doesn't remember any treatment being recommended and there was something about not having enough money to pay for anything else. She states she was just living with the pain and Dr. LeGlue finally released her back to work. She's had an ACL repair of the right knee back in 2000. A year or so before that she had a miscal repair of the left knee. She states her knees were fine except she had had some sciatica on the left side before the fall. It was getting better and now it is worse. She was having some problems with her back before, stating that she was taking gabapentin before the she fell, but she's had to increase her dosage since the fall. Again, she was in an auto accident back in October of 2015 and initially she

---

[1] This court concluded that Ms. White "failed to offer into evidence any 'objective medical evidence' from any of the healthcare providers that treated her before July 27, 2016, to 'prov[e] by clear and convincing evidence h[er] physical inability to engage in any employment[.]'" *White, Id.* at 252, *citing Jackson v. Domtar Indus., Inc.*, 98-1335, pp. 6-7 (La.App. 3 Cir. 4/7/99), 732 So.2d 733, 738, *writ denied*, 99-1369 (La. 7/2/99), 747 So.2d 21.

4

states that she didn't have a doctor, but they just have her some medication, . . . then she admitted that she saw Dr. LeGlue. . . .

PHYSICAL EXAMINATION: . . . . She has full range of motion of the right upper extremity including the shoulder and actually slams her hand down on the table and her leg at times demonstrating things. . . . Ms. White has osteoarthritic changes or post-traumatic changes to both knees. She has no complaints with manipulation of the hips or the knees. There is no swelling, there is no warmth or induration of the knees. Vigorous motor testing is normal in all groups of both lower extremities. Motor testing is normal in all groups of both upper extremities except about the left shoulder girdle, which was not tested because of her recent surgery. . . .

REVIEW OF STUDIES: We had some records from CHRISTUS Health System. All we had were x-ray reports. One of the LS spine and both knees. All three sets of films showed degenerative changes. No x-rays were reported of the elbow, shoulders, etc. . . . The only records we had from Dr. LeGlue were after the accident and it would be very important to get any and all records from Dr. LeGlue before the fall, including any MRI scans. . . . There is much in the way of chronic changes including cystic changes on both sides of the joint and about the AC region. There is advance AC arthritis on the left side without any inferior spurring or impingement. This is all chronic and not at all unexpected in a 60 year old lady.

Ms. White had a follow-up appointment with Dr. Stubbs on February 20, 2017. Dr. Stubbs's report from that date states that Ms. White was "also complaining of bilateral knee pain and right shoulder pain for which she would like treatment. At this time I will formally request approval for treatment of both knees and her right shoulder. The patient claims that her knees and right shoulder are directly related to her injury." In addition, on March 8, 2017, Dr. LeGlue ordered an MRI of Ms. White's right shoulder. Records from that date indicate that Ms. White had seen Dr. Melanie Firmin for a lumbar injection and that Ms. White "continue[s] with persistent neck pain and shoulder pain on the right which Dr. Firmin states she is going to address in the near future after the lumbar interventions."

On July 17, 2017, almost eleven months after filing her original Form 1008, Ms. White filed a second Form 1008 with the workers' compensation court related to the May 28, 2016 fall. In addition to alleging that she sustained injuries to her knees, upper back, neck, and left shoulder, she further alleged that she sustained injuries to her right shoulder and lower back. She also sought approval of an MRI of her right shoulder as recommended by Dr. LeGlue on March 8, 2017, as well as penalties and attorney fees for WIS's failure to approve the MRI. The proceedings related to the August 2016 Form 1008 and the July 2017 Form 1008 were eventually consolidated in the workers' compensation court.

WIS filed an Answer on August 7, 2017, generally denying Ms. White's assertions, and challenging causation with respect to Ms. White's alleged injury to her right shoulder.

On October 13, 2017, WIS filed an amended Answer asserting that Ms. White had made various intentional misrepresentations in her deposition on October 9, 2017, in violation of La.R.S. 23:1208. Specifically, WIS alleged that Ms. White was intentionally untruthful when: (1) denying that she had any problems with any of the parts of her body she claims were injured in the May 28, 2016 fall prior to an auto accident in October 2015, other than bilateral knee surgery; (2) stating she was asymptomatic from injuries she sustained in the October 2015 auto accident from the date of a medical release from her doctor through the May 28, 2016 fall; (3) denying she had been referred to any other medical provider related to injuries sustained in the 2015 auto accident; (4) denying she had shoulder pain prior to the subject incident; and (5) denying the existence of any other claims, despite "the existence of a claim against State Farm

6

in 2006[,] which on information and belief resulted in [Ms. White] having a lumbar MRI."

Between March 21, 2018, and November 13, 2018, Ms. White filed four additional amending Form 1008s, adding claims against WIS for its failure to approve an evaluation of Ms. White's right shoulder, which was recommended by Dr. Stubbs in February 2017; its failure to approve Dr. LeGlue's July 24, 2017 referral to Dr. Stubbs for an orthopedic evaluation of Ms. White's bilateral knee pain; its failure to approve bilateral knee replacement surgery following an evaluation by Dr. Stubbs on June 21, 2018; its failure to approve repeat cervical and lumbar MRIs as recommended by Dr. LeGlue on July 12, 2018;[2] and its failure to approve treatment for chronic pain management recommended by Dr. LeGlue beginning in June 2017.

Trial was held on February 13, 2019. The parties stipulated that Ms. White was an employee of WIS at the time of the May 28, 2016 accident, that Ms. White had an accident (a fall) on May 28, 2016, that Ms. White was in the course and scope of her employment with WIS at the time of the fall, and that Ms. White's weekly compensation rate was $164.30.

In addition, WIS submitted evidence reflecting that it had paid Ms. White weekly TTDs from July 27, 2016, through January 25, 2019, as well as $75,271.93 in medical expenses on behalf of Ms. White. At issue was Ms. White's entitlement to TTDs from the date of the accident, whether the additional medical treatment Ms. White sought with respect to her right shoulder, knees, neck, and back, as well as treatment for pain management, were causally related to the May 28, 2016 fall,

---

[2] We note that, Dr. LeGlue's report dated August 21, 2018, states that Ms. White "has been approved for [a] repeat cervical MRI scan, and this is appreciated. We do await repeat lumbar MRI as well."

whether WIS was liable for penalties and attorney fees for failing to approve the requested medical treatment, and whether Ms. White made intentional misrepresentations in violation of La.R.S. 23:1208, thereby forfeiting her claims.

Following a two-day trial and post-trial briefing, the workers' compensation judge (WCJ) issued oral reasons for ruling, stating:

> I noted in the Defendant's [WIS's] brief everything they pointed out with respect to their challenges not only of Ms. White's credibility[,] but of her failure to disclose previous injuries to body parts she claimed to be injured in this accident.
>
> So in this accident she claims injuries to her neck, her left shoulder, her right shoulder, her low back, and both of her knees. In the past, Ms. White also had some car accidents. The most recent accident before this job injury occurred in October 2015, and Ms. White testified at trial that the only injury she had in that . . . accident was to her neck and her low back, and she denied any injuries to any other body parts, particularly her shoulders.
>
> She was also challenged during trial with the fact that with regard to the injuries to her shoulders when she first presented to the emergency room at St. Francis Cabrini Hospital, there were no complaints with regard to her shoulders. When she first went to Kisatchie Medical Center [Dr. Brar] June 1st of 2016, there were no complaints concerning her shoulders. . . .
>
> She was also confronted at trial with various medical records indicating complaints to these body parts occurring and examined by the physicians, particularly with respect to her shoulders and low back although she denied that these medical records were correct during trial.
>
> And she was confronted at trial about a 2006 motor vehicle accident that [WIS] had [obtained] settlement records for from State Farm Insurance Company, and she admitted being in an accident during that time, but she declared before the Court that this settlement with State Farm was not her settlement, that she wasn't injured in that accident, and that the settlement was really for her daughter, and she and her daughter simply signed the settlement forms in the wrong places . . . .
>
> So in reviewing [WIS's] Exhibit with respect to that 2006 auto accident . . . I discovered in that settlement paperwork that . . . primarily consisted of physical therapy bills . . . where she was having

8

therapy sessions for both of her shoulders, her cervical spine, and her lumbar spine.

. . . .

And I'd like to point out . . . that Ms. White saw Dr. Firmin in response for some pain management for a cervical condition . . . [on] December 7, 2016.  On page 29 of [the] sign-in record or form filled out by Ms. White, there's a section that says "Past Family and Social History."  In that section it says "A – Past Pain History; do not describe present problem.  Mark only the applicable ones."  No. 1 is a motor vehicle accident.  She checks that section and puts the date in of October 2015.  In No. 5, she checks that and that is pain in neck.  No. 6 is significant to this Court in the fact that Ms. White denied previously in court that she had any shoulder pain from that October 2015 accident . . . .  But she checks No. 6, pain in upper extremities, and writes on the blank line, "Shoulder pain in left and right." She also checks . . . No. 10; pain in the joints with -- and it says in parentheses, "Example: shoulder, hip, or knee," and she underlines shoulder.

Now, about two months subsequent to seeing Dr. Firmin, she is seeing Dr. [Stuart] Begnaud, a referral from [WIS], and the patient history sign-in form she dates that February 11, 2017. . . . [T]here's a question about previous injuries.  In parentheses, "Include fractures, head injuries, auto accidents, workers' compensation, et cetera," and she lists only the . . . accident May 28th of 2016, and she indicates for that accident she's only been seen by the Cabrini hospital, the ER doctor. . . . And she lists the October 2015 auto accident indicating to that doctor she was seen at Cabrini Hospital by the emergency room doctor.  She makes no mention in that that [sic] she ever had shoulder complaints from [the] October 15, 2015, automobile accident, but it clearly indicates in the records that she did.

. . . [W]hat really sold this Court on more than the lack of credibility of Ms. White in failing to disclose all these things, we see from the 2006 records settlement with State Farm a long history of left shoulder, right shoulder, right shoulder muscular atrophy in the rotator cuff region, over roughly six months' worth of physical therapy treating all those things, apparently aggravated in the 2006 accident, which she didn't disclose to anyone at any time ever.

. . . .

But what really stood out during the day of the trial was the attempt by Ms. White to sell the Court on a notion that in 2006, although she was in this motor vehicle accident, she was not injured at all, and that the settlement was not her settlement, that it was the settlement of her daughter.  It was the look on her face when she was

looking at the Court telling the Court this. . . . that little sheepish batty-eye look, . . . that's really what I got from Ms. White.

And so judging by that expression on her face and the review of the records and the lengthy history of left and right shoulder complaints, I am firmly convinced that her statement or misstatements and denials of these past problems - - they were not inconsequential; in fact, they were consequential. . . .

. . . .

So these failures on behalf of Ms. White and these denials of the injury in the 2006 motor vehicle accident and denial of injuries to her shoulders in the 2015 automobile accident, denials of chronic back pain, repeatedly disagreeing with her various medical records about complaints of injuries or pain problems in those areas, and the number of times including her expression on her face convinced this Court that this was not inadvert. This was, in fact, willful, deliberate, intentional.

Thereafter, the WCJ signed a judgment in favor of WIS and dismissing Ms. White's claims. The judgment further states that Ms. White "made material misrepresentations willfully for the purposes of obtaining Worker's Compensation benefits in violation of [La.R.S.] 23:1208 and forfeits all benefits."

Ms. White appeals. She asserts the following as assignments of error:

1) The WCJ erred in his decision that Appellant committed fraud pursuant to La. R.S. 23:1208. In the alternative, if the decision concerning fraud was not in error, the WCJ committed legal error by dismissing all claims made prior to fraud being committed.

2) The WCJ erred in his decision to admit into evidence the 1442 deposition of WIS and the deposition of [the] WIS adjuster, that were taken by Appellant during discovery, without proof that the deponents were unavailable to testify.

3) The WCJ erred in his decision to admit irrelevant hearsay documents at trial.

4) The WCJ erred in its failure to rule on timely, valid objections made at trial.

5) The WCJ erred in its decision to allow Appellee to expand its pleadings during trial over the objection of Appellant.

6) The WCJ erred in his decision to deny indemnity benefits to Appellant from the date of injury through the date indemnity benefits began.

7) The WCJ erred in its decision to deny medical benefits to Appellant for Right shoulder MRI, evaluation and treatment of right shoulder, orthopedic evaluation for bilateral knee pain, cervical MRI, bilateral knee replacement surgery, lumbar MRI, and treatment for chronic pain management.

8) The WCJ erred in its decision to deny any award to Appellant for penalties and attorney's fees.

## ANALYSIS

Evidentiary Issues:

On appeal, Ms. White raises various evidentiary issues. We will address those first. "On review, a trial court's decisions regarding the admissibility of evidence is afforded vast discretion and will not be reversed absent an abuse of that discretion." *Soileau v. TMC Foods, Inc.*, 14-144, p. 9 (La.App. 3 Cir. 8/6/14), 145 So.3d 1112, 1118.

In her second assignment of error, Ms. White challenges the WCJ's admission of the deposition of Ms. Molina, the workers' compensation claims' adjuster, and the deposition of WIS's designated corporate representative, Lee Rosenthal, into evidence in lieu of their trial testimony.

Louisiana Code of Civil Procedure Article 1450, which pertains to the use of depositions, states in pertinent part as follows:

> A. At the trial . . . , any part or all of a deposition, so far as admissible under the Louisiana Code of Evidence applied as though the witnesses were then present and testifying, may be used against any party who was present or represented at the taking of the deposition . . . , in accordance with any of the following provisions:
>
> . . . .
>
> (3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:

. . . .

(b) That the witness resides at a distance greater than one hundred miles from the place of trial or hearing or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition[.]

In the instant case, Ms. Molina, was compelled by Ms. White's counsel to travel from Irving, Texas, to Alexandria, Louisiana, for a deposition on October 18, 2018. Ms. Molina testified therein that she lives and works in Texas. Similarly, in accordance with La.Code Civ.P. art. 1442, Ms. White's counsel compelled a designated representative for WIS, Lee Rosenthal, who lives and works in Pennsylvania, to travel to Alexandria, Louisiana, for a deposition on October 18, 2018. Given that both witnesses reside outside of Louisiana, we find no abuse of discretion on the part of the WCJ in admitting their depositions into evidence.

In her third assignment of error, Ms. White argues that the WCJ erred in admitting the following evidence into the record because, according to Ms. White, it was irrelevant: a document reflecting the amount of benefits WIS had paid to Ms. White; the depositions of Ms. Molina and WIS's corporate representative, Lee Rosenthal; Ms. White's certified and complete medical records from Cabrini Hospital, Kisatchie Medical Center, Dr. LeGlue, Dr. Garrison, Rapides Regional, and MRI Imaging; Ms. White's certified pharmacy records from Sentry Drugs; a certified copy of the claims files from Progressive Insurance Company pertaining to Ms. White's claim from the October 2015 auto accident, as well as another claim from January 2001; a certified copy of the claims file from State Farm Insurance Company pertaining to Ms. White's claim following a 2006 auto accident; and Ms. White's Louisiana income tax returns. The extent of Ms. White's limited argument in her brief to this court is that "some of the records

12

concerned events which occurred more than fourteen (14) years before trial. Many of the medical records concern gynecologic treatment, internal medicine issues, and treatment for colds, cough, etc."

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code Evid. art. 401. We find no support for Ms. White's argument that the aforementioned evidence was irrelevant to her current claim for workers' compensation benefits. Rather, these documents are relevant to Ms. White's claims for medical and indemnity benefits, penalties, and attorney fees. The challenged exhibits include evidence concerning WIS's handling of her claim, whether and to what extent her claimed injuries were caused by the fall at issue, whether her claims involved pre-existing conditions or prior injuries, and whether her ability to work was affected by the fall at issue. The challenged exhibits also include evidence relevant to WIS's claim that Ms. White intentionally mispresented her past claims and injuries in violation of La.R.S. 23:1208. Therefore, Ms. White's argument lacks merit.

Ms. White also argues on appeal that medical records contained within State Farm's certified file pertaining to her 2006 auto accident claim are inadmissible hearsay. She further argues that the WCJ impermissibly relied on these inadmissible medical records, which show a prior history of reported shoulder pain and treatment, when ruling on Ms. White's credibility and violation of La.R.S. 23:1208.

As recognized by the Louisiana Supreme Court in *Chaisson v. Cajun Bag & Supply Co.*, 97-1225, pp. 9-13 (La. 3/4/98), 708 So.2d 375, 381-82:

[U]nder the express language of LSA–RS 23:1317, worker's compensation hearing officers are "not bound by the technical rules of evidence." *Id.* In other words, the hearing officer has the discretion to admit evidence that would otherwise be inadmissible under the Louisiana Code of Evidence. This more relaxed standard for the admissibility of evidence is the general rule in proceedings before administrative agencies. MCCORMICK ON EVIDENCE § 352 (4th ed.1992). The legislative requirement that a hearing officer's factual findings be based upon competent evidence is the safeguard that ensures that the factual findings are made on evidence that has some degree of reliability and trustworthiness, notwithstanding that the evidence might fall outside of the technical rules for admissibility. . . . Although the Legislature has not defined "competent evidence," in order to give the relaxed evidentiary standard in LSA–RS 23:1317 effect, it must not be defined so narrowly as to mean only evidence that would fall within the parameters of the Louisiana Code of Evidence.

. . . .

To give effect to the more relaxed evidentiary standards in LSA–RS 23:1317, we hold that the hearing officer has the discretion to admit hearsay evidence in worker's compensation proceedings. We further hold that such evidence can qualify as "competent evidence," provided that the evidence has some degree of reliability and trustworthiness and is of the type that reasonable persons would rely upon. This determination must be made on a case-by-case basis under the particular facts and circumstances. The reviewing court must evaluate the competency of the evidence under the manifest error standard.

In the instant case, the certified State Farm claims file includes medical records from Louisiana Physical Therapy Centers pertaining to Ms. White. It also includes a letter dated July 21, 2006, from Louisiana Physical Therapy Centers to State Farm certifying that the enclosed records for Ms. White from December 16, 2005, through July 10, 2006, were true and correct. The State Farm claims file also contains information concerning payments made by State Farm for treatment rendered by Louisiana Physical Therapy Centers to Ms. White. Moreover, at trial, Ms. White admitted to signing the State Farm settlement release pertaining to the

2006 accident, although she stated she signed it for her daughter. She further testified that she had no reason to disagree with what the medical records stated.

Based on the above, we find that, under the relaxed evidentiary standards provided by La.R.S. 23:1317, the WCJ did not abuse his discretion in admitting the medical records contained within State Farm's certified claims file, as the record supports a finding that the records have "some degree of reliability and trustworthiness and [are] of the type that reasonable persons would rely upon." *See Chaisson,* at 382.

In her fourth assignment of error, Ms. White argues that the WCJ "failed to rule on objections made during depositions, which were then admitted into evidence[,]" and "the WCJ failed to rule on numerous objections made during the 1442 deposition of WIS and the deposition of the claims adjuster, Rebecca Molina." Ms. White fails to otherwise brief this argument, much less direct this court to any citations in the record pertaining to any specific objections made during depositions, or to any rulings by the WCJ on any such objections. Moreover, there is no indication in the trial transcript that Ms. White's counsel asked the WCJ to rule on any particular objection made during any deposition, but rather simply said "I will bring it to your attention that you'll need to rule on the multiple objections throughout the deposition as well, please." Without any specificity provided to either the WCJ or to this court regarding any specific objections made during depositions, we find that this assignment of error lacks merit.

In her fifth assignment of error, Ms. White challenges the WCJ's allowance of WIS's counsel to question Ms. White at trial regarding her past shoulder treatment with Dr. Gregory Bevels in connection with the 2006 auto accident. Specifically, Ms. White argues that allowing such questioning was an improper

expansion of the pleadings. We find no error in the WCJ's allowance of this questioning as it directly relates to WIS's claims under La.R.S. 23:1208 that Ms. White intentionally misrepresented that prior to the fall at issue, she did not have any issues or complaints with regard to her shoulders. Therefore, this assignment of error lacks merit.

Intentional Misrepresentation Under La.R.S. 23:1208:

On appeal, Ms. White also challenges the WCJ's finding that Ms. White violated La.R.S. 23:1208 and its denial of her claims for indemnity benefits, authorization of various medical treatment, and penalties and attorney fees.

Louisiana Revised Statutes 23:1208 states as follows:

> A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
>
> . . . .
>
> E. Any employee violating this Section shall, upon determination by workers' compensation judge, forfeit any right to compensation benefits under this Chapter.

In *Resweber v. Haroil Construction Company,* 94-2708, pp. 7-10 (La. 9/5/95), 660 So.2d 7, 12-14, the Louisiana Supreme Court addressed claims under La.R.S. 23:1208 and stated:

> Section 1208 is clear and unambiguous and as such will be applied as written. La.Civ.Code art. 9; La.R.S. 1:4. Section 1208 clearly applies to *any* willful false statements or representations made "for the purpose of obtaining or defeating any benefit or payment." Section 1208 has no language limiting it to only certain types of false statements, *i.e.,* statements other than those relating to prior injuries. The legislature has imposed no notice requirement in Section 1208, apparently being of the opinion that any claimant should be on notice that false statements made willfully for the purpose of obtaining workers' compensation benefits will not be tolerated and will result in the forfeiture of those benefits. The only requirements for forfeiture of benefits under Section 1208 are that (1) there is a false statement or

16

representation, (2) it is willfully made, and (3) it is made for the purpose of obtaining or defeating any benefit or payment.

Our conclusion is further buttressed by the legislative history of Sections 1208 and 1208.1. The history of Section 1208 indicates a clear legislative intent to prevent and discourage fraud in relation to workers' compensation claims, and Section 1208 should not be subjected to a strained interpretation which would undercut that legislative intent. . . .   The legislature has determined workers' compensation fraud is a severe and growing problem and has continually amended Section 1208 to make it easier to enforce and to make the penalties stiffer. It is clear from the history of the statute that the legislature intended that any false statements or representations willfully made for the purpose of obtaining benefits would result in forfeiture of those benefits, and this legislative intent cannot be ignored.

. . . .

We therefore hold that Section 1208 applies to any false statement or misrepresentation, including one concerning a prior injury, made willfully by a claimant for the purpose of obtaining benefits, and thus is generally applicable once an accident has allegedly occurred and a claim is being made.

Similarly, in *St. Bernard Parish Police Jury v. Duplessis,* 02-632 (La. 12/4/02), 831 So.2d 955, the Louisiana Supreme Court held that *any* fraudulent statement in violation of La.R.S. 23:1208 made in an attempt to obtain *any* particular workers' compensation benefit (i.e. mileage in *Duplessis*), will result in the employee's forfeiture of *all* worker's compensation benefits (i.e. disability benefits in *Duplessis*), even if the fraudulent statement was unrelated to other claimed benefits.  Specifically, the court reasoned:

[P]ursuant to LSA–R.S. 23:1208, any person who willfully makes a false statement or representation "for the purpose of obtaining any benefit or payment" shall "forfeit any right to compensation benefits under this Chapter." In this case, Mr. Duplessis [the employee] does not dispute the finding that he willfully made false statements on the mileage reimbursement forms for the purpose of obtaining additional mileage reimbursement payments. Rather, he argues that he should not be subjected to the forfeiture of benefits that are unrelated to the fraudulent statements. He specifically contends that LSA–R.S. 23:1208(E) "is ambiguous as to whether one or all benefits provided

17

by the Workers' Compensation Act should be forfeited; thus, the ambiguity should be resolved in favor of coverage for the injured worker." Mr. Duplessis argues that the word "any" is ambiguous and must be narrowly construed in his favor.

We disagree. As this court found in *Resweber*, [660 So.2d 7], LSA–R.S. 23:1208 is unambiguous. The Louisiana Legislature has made it clear: false statements that are willfully made for the purpose of obtaining workers' compensation benefits constitutes an attempt to defraud the workers' compensation system. Therefore, once it is determined that a claimant has willfully made a false statement for the purposes of receiving any benefit or payment, the plain language of the statute mandates that the "right to compensation benefits" under the Workers' Compensation Act are forfeited. Thus, the only remedy for a willful misrepresentation, made for the purposes of obtaining workers' compensation benefits, is found within the Workers' Compensation Act, and, therefore, cannot be abridged by this court.

*Id.* at 961.

We further recognize that a forfeiture of benefits under La.R.S. 23:1208 "is a harsh remedy and, therefore, must be strictly construed. False statements that are inadvertent or inconsequential will not result in forfeiture. Whether an employee has forfeited his right to workers' compensation benefits is a question of fact that will not be disturbed on appeal absent manifest error." *KLLM, Inc. v. Reed*, 00-295, p. 6 (La.App. 3 Cir. 10/11/00), 771 So.2d 728, 731 (citations omitted).

In the instant case, in ruling that Ms. White made intentional misrepresentations in violation of La.R.S. 23:1208, the WCJ first stated in its oral reasons that it noted the same issues with respect to Ms. White's credibility and failures to disclose prior injuries to parts of her body she claims were injured in the subject work accident that WIS noted in its post-trial brief.

With respect to Ms. White's claimed right shoulder injuries, WIS noted in its post-trial brief that Ms. White testified during her deposition and at trial that she had no prior history of pain in either shoulder. It also noted Ms. White's indication

to various medical providers that she did not have shoulder problems before the work accident.

However, as also noted by WIS, Ms. White's testimony and indications to her medical providers is contradicted by medical records in evidence reflecting that she had a history of right shoulder complaints as early as 2005; she reported injuries to her right shoulder as a result of a 2006 auto accident and received medical treatment and settlement compensation in connection therewith; she reported shoulder joint pain in connection with routine appointments at Cabrini Community Clinic in 2015; and she reported shoulder pain following a car accident in October 2015.

In addition, as noted by WIS in its post-trial brief, Ms. White testified that she initially reported right shoulder pain when she sought treatment from Cabrini Hospital immediately following the accident, that she was "hurting all over" when she saw Dr. Brar on June 1, 2016, and that she reported complaints pertaining to her right shoulder when she first saw Dr. LeGlue on July 18, 2018. Ms. White further reported to an Independent Medical Examiner, Dr. Bernard, in November 2016 that her right shoulder hurt her immediately following the fall and that she was upset because she had surgery on her left shoulder instead of her right.

However, as noted by WIS, Ms. White's medical records and other documentary evidence do not support her testimony and other statements suggesting she experienced right shoulder pain immediately following the fall. There is no reported shoulder pain or other related complaints either in the incident report that she completed, in her records from Cabrini Hospital on the day of the work accident, or in Dr. Brar's records from June 1, 2016. Further, while Dr. LeGlue's records from Ms. White's initial visit on July 27, 2016, and related intake

form Ms. White completed on July 18, 2016, reflect Ms. White's reports of left shoulder pain and Dr. LeGlue's recommended evaluation for possible left rotator cuff surgery, there are no specific reports of right shoulder pain.[3] This is consistent with Ms. White's original Form 1008 Disputed Claim for Compensation she filed on August 31, 2016, wherein she alleges she sustained injuries to her left shoulder as a result of the work accident, but makes no mention of sustaining any injuries to her right shoulder. Similarly, Dr. Begnaud's report from a January 11, 2017 evaluation of Ms. White for the purposes of a second medical opinion, notes Ms. White's right shoulder complaints but that he did not see any initial right shoulder complaints in Dr. LeGlue's records.

In addition, Dr. Stubbs's records from October 2016 through January 2017 following Dr. LeGlue's referral for left-shoulder rotator cuff surgery do not reflect any complaints of right shoulder pain. Dr. Stubbs's records do not mention any reports of right shoulder pain until February 20, 2017, wherein he noted "she's also complaining of bilateral knee pain and right shoulder pain for which she would like treatment. At this time I will formally request approval for treatment of both knees and her right shoulder. The patient claims that her knees and right shoulder are directly related to her injury."

With respect to Ms. White's claimed knee injuries, WIS noted in its post-trial brief that when Ms. White saw Dr. Dodson in August 2016 and Dr. Begnaud in January 2017 she reported that she did not have any knee pain prior to her fall.

---

[3] The pain diagram completed by Ms. White clearly indicates left shoulder muscle pain, as the left shoulder on the diagram is darkened in. There is also a line from the left shoulder to the middle of the back on the pain diagram that states "cross shoulder" but there is no specific indication of any right shoulder pain. The right shoulder is not darkened in on the pain diagram as is the left. We further note that while Ms. White argues on appeal that another pain diagram she completed that day reflects an initial report of right shoulder pain because it has the words "muscle pain – arm get[s] weak" written diagonally so that the words cross the right shoulder, there is actually an arrow pointing from those words to the left arm.

However, according to Dr. Gunderson's report from November 8, 2018, after performing an independent medical examination of Ms. White, he noted Ms. White's indication that she had experienced mild knee pain prior to the injury but was able to do her job. Ms. White's trial testimony also contradicts what she reported to Dr. Dodson, as she indicated that she has had pain in her knees from the time she had knee surgery in 2000 through the date of the work accident.

In addition, Ms. White testified at trial that she has limped at all times since the work accident. At trial, she used a walker to assist her. However, as WIS noted, Ms. White's medical records show multiple medical appointments following the fall through at least April 2018, as well as a Functional Capacity Examination, wherein her gait was observed to be normal. Ms. White's only explanation at trial was that these medical records were incorrect. Medical records beginning in June 2018 show that Ms. White was ambulating with a walker.

WIS further noted in its post-trial brief that Ms. White testified both in her deposition and at trial that she injured only her lower back and neck in connection with the 2015 accident, she had recovered from all of her injuries by the time Dr. LeGlue released her to return to work on December 23, 2015, and that since that time through the date of the work accident, she has had no other complaints or treatment related to her back or neck. In addition, Ms. White reported to Dr. Bernard in November 2016 that she had no recollection of any treatment being recommended by Dr. LeGlue following the 2015 auto accident. Ms. White also reported to Dr. Gunderson, an Independent Medical Examiner, in November 2018, that she was able to do her job for five or six months prior to the work accident and has more complaints now than she did before.

However, WIS further noted various medical records contradicting Ms. White's testimony, including Dr. LeGlue's report dated December 8, 2015, noting that Ms. White was seen following the October 2015 auto accident "with complaints of continued neck and shoulder pain with increased lower back pain with left leg pain and paresthesias," and ordering an MRI. Dr. LeGlue's report from December 22, 2015, notes that both cervical and lumbar MRIs were abnormal, that he was placing Ms. White on a 20lb lifting restriction, and that he referred her for a spine surgery evaluation. Dr. LeGlue further testified in his deposition that on December 23, 2015, he gave Ms. White a handwritten note at her request that generally released her to return to work but that doing so was subject to his recommended 20lb lifting restriction, even though that specific restriction was not written on the release to work.

In addition, WIS noted evidence of Ms. White's settlement of her claim pertaining to the 2015 auto accident in January 2016. This settlement followed a letter from Ms. White's counsel to the claims adjuster that referred to a December 22, 2015 report from Dr. LeGlue and stated that "it is apparent that the treatment of my client's injuries will far exceed the limits of your insured's policy. Therefore, I am requesting you tender the policy limits at this time." Similarly, WIS noted Dr. Begnaud's report from January 2017 following an evaluation of Ms. White, noting that surgery had been recommended from the 2015 accident, but that surgery had not been done due to financial issues.

WIS also noted Ms. White's records from Cabrini Hospital from the day of the work accident, which indicated a history of chronic back pain, as well as Ms. White's testimony at trial denying the accuracy of the medical records.

Finally, in its post-trial brief, WIS also noted Ms. White's trial testimony that she has had pain at all times since the accident and every day as it relates to every part of her body she claims was injured. However, WIS also pointed out medical records contradicting Ms. White's testimony, including a report by Dr. Martin Tanner on November 14, 2016, noting she could walk without assistance, sit comfortably on the examination table without evidence of pain, and had full range of motion in her neck. In addition, Ms. White's medical records from Rapides Regional on July 14, 2017, reflect that she denied back, neck, extremity or joint pain, she had a painless range of motion in her back, and she had a full range of motion in her neck. At trial, Ms. White denied reporting this to her medical provider and testified that neither her neck nor her back were examined.

In addition to the various contradictory testimony and evidence pointed out by WIS in its post-trial brief, and acknowledged by the WCJ, the WCJ also noted in its oral reasoning other contradictory evidence and testimony, including medical records contained within the State Farm claims file pertaining to the 2006 auto accident indicating that Ms. White had shoulder therapy as early as 2005, as well as in connection with injuries following the 2006 auto accident.

The WCJ further focused on Ms. White's demeanor at trial when being questioned about these various contradictions, and especially when questioned about the 2006 auto accident and related settlement. The WCJ specifically took issue with Ms. White's attempt to "sell" to it the argument that she was not injured in that accident and that the settlement was meant for her daughter. It also took issue with her denial of her prior shoulder injuries and repeated disagreements with her medical records, and further noted the "expression on her face" when confronted with various evidence. Therefore, the WCJ concluded, "I am firmly

convinced that her statement or misstatements and denials of these past problems -- they were not inconsequential; in fact, they were consequential."

The record substantiates the multiple misrepresentations by Ms. White concerning her past physical injuries which were noted by both the WCJ and WIS. Based on our review of the record, we find a reasonable factual basis exists to support the WCJ's conclusions that Ms. White made false statements, that such statements were made willfully, and were made for the purpose of obtaining workers' compensation benefits. Therefore, we find no error in the WCJ's dismissal of Ms. White's claims.

We further note Ms. White's argument that any intentional misrepresentation in violation of La.R.S. 23:1208 results in a forfeiture of benefits only from the date of the misrepresentation, rather than retroactively to the date of the work accident. Therefore, according to Ms. White, it was error for the WCJ to deny all of her claims and this court should remand the case to the WCJ for a determination of whether she is entitled to any benefits prior to the date of any intentional misrepresentations.

Ms. White's argument is based on this court's ruling in *Apeck Constr. Inc. v. Bowers*, 03-486 (La.App. 3 Cir. 12/10/03) 862 So.2d 1087, *writ denied*, 04-459 (La. 4/23/04), 870 So.2d 301, and a similar ruling in *Jim Walter Homes v. Guilbeau,* 05-1473 (La. App. 3 Cir. 6/21/06), 934 So.2d 239. In *Apeck Constr.*, 862 So.2d at 1092-93, we stated:

> While a worker may forfeit the right to all types of workers' compensation benefits when he violates La.R.S. 23:1208, . . benefits are not forfeited until the misrepresentation occurs, in this case the date of the deposition[.]
>
> . . . .

24

Before the misrepresentation, there has been no punishable conduct. The triggering mechanism is the fraudulent conduct. *Resweber*, 660 So.2d 7, (See footnote 7). Once the misrepresentation occurs, the provisions of La.R.S. 23:1208 apply, and from that point the claimant's right to benefits is forfeited.

In both of these cases, however, there was no dispute that the employee was otherwise entitled to benefits prior to the employees' fraudulent misrepresentations. In the instant case, on the other hand, all of Ms. White's claims for indemnity and medical benefits are disputed, and the intentional misrepresentations noted by both WIS and the WCJ are directly related to the those claims. The record reasonably supports the WCJ's findings with respect to Ms. White's lack of credibility and intentional misrepresentations in violation of La. R.S. 23:1208; therefore, we find no error in WCJ's denial of Ms. White's claims.

## DECREE

For the reasons set forth above, we affirm the WCJ judgment in this matter. Costs of this appeal are assessed to Appellant, Debra White.

**AFFIRMED.**

25